O’Connor, C.J.,
dissenting.
{¶ 52} In declaring our nation’s independence, the founders decreed that the inalienable right to liberty was a self-evident truth. The founders recognized that they were asking a substantial sacrifice of colonists: to give up some of that liberty to live in a civil society on the mere promise that the government would secure their liberty and other important rights. Advocating for ratification of the Constitution, Alexander Hamilton offered reassurance to doubters that their rights would be protected by checks and balances because “liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments.” The Federalist No. 78 at 523 (Cooke Ed.1961).
{¶ 53} James Madison also supported the separation of powers, writing that it “is admitted on all hands to be essential to the preservation of liberty” but warning that another particularly applicable consideration in American government would be “to guard one part of the society against the injustice of the other part.” The Federalist No. 51 at 351 (Cooke Ed.1961). Madison advised:
Justice is the end of government. It is the end of civil society. It ever has been, and ever will be pursued, until it be obtained, or until liberty be lost in the pursuit. In a society under the forms of which the stronger faction can readily unite and oppress the weaker, anarchy may as truly be said to reign as in a state of nature, where the weaker individual is not secured against the violence of the stronger * * *.
Id. at 352.
{¶ 54} The majority’s decision today brings us one step closer to the anarchy about which Madison warned. The majority blindly affirms the constitutionality of the mandatory-transfer statute’s process without even a perfunctory analysis of its due-process implications. The majority’s holding does not bring justice for Ohio’s children, who are among our weakest citizens, nor does it honor the sacrifices of our founders by “seeur[ing] the Blessings of Liberty” to future generations, U.S. Constitution, preamble. Instead, the majority bows to the basest instincts of an outspoken faction of our society—fear and anger—to reach a result that violates all notions of separation of powers by advancing the *507 interests of the executive and legislative branches at the expense of the judiciary. In its effort to punish appellant, Matthew I. Aalim, the majority shows no respect for the judiciary’s role of ensuring that no legislative act contrary to the Constitution be allowed to stand. We all will suffer, at least in the short term, as a result of today’s decision.
{¶ 55} Fortunately, however, the United States Supreme Court has not been so quick to dispense with its own role or the principles upon which our country was founded. The high court recognizes that “[d]ue process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise.” In re Gault, 387 U.S. 1, 20, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
{¶ 56} The right to due process of law is not limited to adults facing a deprivation of liberty. Id. at 13. Rather, it is an essential and eternal promise of the Constitution to all Americans, including our youth. Although a child is too young to vote for their legislators and, in Ohio, their judges, those legislators and judges cannot ignore the constitutional protections safeguarding a child’s liberty. And even though good motives may have informed the development of the juvenile court systems throughout the United States, the Supreme Court has reminded us that “[t]he absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness.” Id. at 18-19.
{¶ 57} After today, in Ohio, an alleged juvenile offender will once again be subject to mandatory transfer out of juvenile court to face an adult criminal conviction on a mere showing of probable cause to believe that the child committed the offense charged, regardless of whether the child is amenable to rehabilitation and treatment in the juvenile-justice system. To deprive a child of his or her liberty with such limited procedure falls short of the “procedural regularity and exercise of care implied in the phrase ‘due process.’ ” Id. at 27-28.
{¶ 58} A majority of the court, under the guise of judicial restraint, reverses on a motion for reconsideration of our decision in State v. Aalim, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862 (“Aalim I”).[2] But make no mistake: the court’s *508 decision approves the arbitrary deprivation of access to the juvenile system and what should be the sine qua non of juvenile-transfer hearings—the determination whether the juvenile is amenable to rehabilitation. The majority does so by affording blind deference to the legislature, ignoring the requirements of due process and fairness, and artificially constraining the United States Supreme Court’s commands that we must consider juvenile offenders differently than adult offenders, see Miller v. Alabama, 567 U.S. 460, 470, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (holding that sentences imposing mandatory life imprisonment without the possibility of parole on individuals who committed their crimes when under the age of 18 violates the Eighth Amendment to the United States Constitution); J.D.B. v. North Carolina, 564 U.S. 261, 265, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) (holding that police must consider the age of a juvenile suspect when determining whether the juvenile is in custody for purposes of Miranda warnings, see Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); Roper v. Simmons, 543 U.S. 551, 570-571, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that the execution of individuals who were under 18 years of age at the time they committed capital crimes violates the Eighth and Fourteenth Amendments to the United States Constitution).
. {¶ 59} The concurring justice’s eagerness to reconsider Aalim I appears to be based on a reluctance to recognize federal substantive-due-process jurisprudence or to incorporate substantive-due-process protections into the Ohio Constitution. This signals a departure from settled law and the maxim that the federal Constitution provides the floor, not the ceiling, for constitutional rights.
{¶ 60} Aalim, an African American youth who was 16 years old and, according to his counsel, had no criminal record at the time of his transfer hearing, was nevertheless treated as an adult and haled into the Montgomery County Court of Common Pleas to face a maximum sentence of over 20 years of imprisonment and $40,000 in sanctions (exclusive of court costs and restitution) on two first-degree-felony counts of aggravated robbery with firearm specifications.[3] Given the *509 importance of the constitutional issue before us, and the Supreme Court’s silence on the constitutionality of juvenile-transfer statutes since its decision more than 50 years ago in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), today’s majority opinion warrants discretionary review by the United States Supreme Court.
{¶ 61} The constitutional vacuum that will now exist in Ohio for juveniles subject to mandatory-transfer hearings cannot be reconciled with the United States Supreme Court’s recent teachings regarding juveniles, nor can it fulfill the Supreme Court’s declaration with respect to transfer hearings that “ ‘there is no place in our system of law for reaching a result of such tremendous consequences without ceremony.’ ” Gault, 387 U.S. at 30, 87 S.Ct. 1428, 18 L.Ed.2d 527, quoting Kent at 554.
{¶ 62} Unable to give countenance to the analysis offered by the majority to achieve its desired result, I dissent.
BACKGROUND
{¶ 63} As the majority notes, the General Assembly established the first juvenile court in Ohio in Cuyahoga County in 1902 and subsequently expanded the system statewide. In re Agler, 19 Ohio St.2d 70, 73, 249 N.E.2d 808 (1969). From their inception, the juvenile courts have dealt with children charged with violating criminal statutes. Whitlatch, The Juvenile Court—A Court of Law, 18 Case W.Res.U.L.Rev. 1239, 1241 (1967). In 1937, the General Assembly vested the juvenile courts statewide with “exclusive original jurisdiction * * * [c]oncern-ing any child who is * * * delinquent.” Am.S.B. 268, 117 Ohio Laws 520, 524 (currently codified at R.C. 2151.23(A)(1)). Accordingly, in Ohio, since 1937, children charged with violations of criminal laws have had a statutory entitlement to be dealt with by juvenile-court judges who have “expertise” due to their familiarity with the juvenile-justice system and its rehabilitative goals, State v. D.H., 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 59.
{¶ 64} As we have previously explained, juvenile courts were established with certain objectives that made them distinct from adult courts, despite their similar roles in adjudicating individuals accused of violating criminal statutes:
The juvenile courts were premised on profoundly different assumptions and goals than a criminal court, United States v. Johnson (C.A.D.C.1994), 28 F.3d 151, 157 (Wald, J., dissenting), and eschewed traditional, objective criminal standards and retributive notions of justice. Instead, a new civil adjudication scheme arose, with a focus on the state’s role as parens *510 patriae and the vision that the courts would protect the wayward child from “evil influences,” “save” him from criminal prosecution, and provide him social and rehabilitative services. In re T.R. (1990), 52 Ohio St.3d 6, 15, 556 N.E.2d 439; Children’s Home of Marion Cty. v. Fetter (1914), 90 Ohio St. 110, 127, 106 N.E. 761; Ex parte Januszewski (C.C.Ohio 1911), 196 F. 123, 127.
In re C.S., 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 66.
{¶ 65} Despite the differing goals of juvenile and adult courts, the establishment of juvenile courts was not a license for the General Assembly to deprive juveniles of their constitutional rights. In fact, juveniles are entitled to a range of rights grounded in constitutional protections. See Kent, 383 U.S. at 562, 86 S.Ct. 1045, 16 L.Ed.2d 84; In re Winship, 397 U.S. 358, 367-368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (applying reasonable-doubt standard to juvenile offenders); Gault, 387 U.S. at 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (recognizing juveniles’ right to counsel in certain juvenile proceedings); State v. Walls, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 26 (“numerous constitutional safeguards normally reserved for criminal prosecutions are equally applicable to juvenile delinquency proceedings”).
{¶ 66} When a state legislature attempts to restrict the constitutional protections owed juveniles, the United States Supreme Court restores them. See Bellotti v. Baird, 443 U.S. 622, 648, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (lead opinion) (a state cannot unduly burden a minor’s right to an abortion); Ingraham v. Wright, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (corporal punishment implicates a child’s liberty interest); Breed v. Jones, 421 U.S. 519, 532-533, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (double-jeopardy protections apply to juveniles). Thus, the court remains an important check on the legislature ensuring the rights of children in juvenile proceedings, just as it is on guard for legislative overreach in other areas of the law.
{¶ 67} We are required to apply the same constitutional check to the mandatory-transfer procedure established in Ohio, considering whether it comports with the requirements of due process and fairness.
{¶ 68} The General Assembly established mandatory transfer in 1986 during a wave of pro-punishment legislation.[4] As this case exemplifies, mandatory-transfer hearings are relatively recent in the scheme of juvenile justice in Ohio and the United States. And because a transfer to adult court almost always is intended *511 to allow for a harsher sentence than a juvenile court could impose, mandatory transfer implicates the punitive aspect of sentencing and deprives the juvenile of access to the rehabilitative hallmarks of the juvenile-justice system.
{¶ 69} That result is not surprising given that mandatory-transfer hearings were borne of state legislators who, after Kent and Gault, had become more sanguine about criminal punishment of young offenders in response to perceived—or misperceived—increases in juvenile crime, see, e.g., Waterfall, Note, State v. Muniz: Authorizing Adult Sentencing of Juveniles Absent a Conviction that Authorizes an Adult Sentence, 35 N.M.L.Rev. 229, 231 (2005). Juvenile-justice policy shifted from a parens patriae mission toward schemes in which punishment played an increasingly prominent role, particularly for juvenile offenders charged with firearm offenses, homicides, and other indicia of gang-related activity. Bishop, Juvenile Offenders in the Adult Criminal Justice System, 27 Crime & Just. 81, 83-84 (2000).
{¶ 70} Rather than seeing the juvenile-justice system’s role as ameliorative and rehabilitative, the new legislative approaches were “ ‘designed to crack down on juvenile crime,’ and generally involved ‘expanded eligibility for criminal court processing and adult correctional sanctioning’ ” of juveniles. Waterfall at 231, quoting Bilchik, U.S. Dept, of Justice, The Juvenile Justice System Was Founded on the Concept of Rehabilitation through Individualized Justice, 1999 National Report Series: Juvenile Justice Bulletin, at https://www.ncjrs.gov/html/ojjdp/ 9912_2/contents.html. See also State v. Hanning, 89 Ohio St.3d 86, 89, 728 N.E.2d 1059 (2000) (the mandatory-transfer statute is “part of Ohio’s response to rising juvenile crime”). Rather than seeing juveniles as misguided and immature but worthy of redemption, the new legislation saw them as vicious and savvy, and “as adult-like, incipient career criminals,” Bishop at 84.
{¶ 71} State legislators were keenly aware of the ramifications of a juvenile’s transfer from juvenile court and its therapeutic milieu to adult court, in which punishment and deterrence are integral. In fact, transfer hearings were at the core of the “get tough” legislative response to the perceived epidemic of juvenile violence in this country, including here in Ohio. Hanning at 89; Redding, Juveniles Transferred to Criminal Court: Legal Reform Proposals Based on Social Science Research, 1997 Utah L.Rev. 709, 710-715 (1997).
{¶ 72} This “transformation of transfer policy has been quick and dramatic.” Bishop, 27 Crime & Just, at 84. Between 1992 and 1997, at least 44 states and the District of Columbia enacted provisions to expediently facilitate the transfer of young offenders to adult court by establishing “offense-based, categorical, and absolute alternatives to individualized, offender-oriented waiver proceedings in the juvenile court” that streamlined the transfer process. Id. “As a result, in many states transfer implicates a broad range of offenders who are neither *512 particularly serious nor particularly chronic, some of whom are not yet in their teens.” Id. at 84-85.
{¶ 73} In Ohio, the mandatory-transfer provision was one of the hallmarks of the state’s “get-tough approach” to crimes committed by juveniles, creating a transfer provision wholly different from the discretionary transfers that previously were the sine qua non of juvenile transfers.[5] Hanning, 89 Ohio St.3d at 89, 728 N.E.2d 1059. In this new regime, it is not the child’s status as a juvenile that governs sentencing but, rather, the forum in which the child offender is adjudicated, so that the sentence ultimately imposed is one that is harsher than what a juvenile court would impose. The transfer hearing implicates far more significant issues than the venue or forum of trial; it serves as a vehicle by which a child offender is deprived of the rehabilitation and treatment potential of the juvenile-justice system.
{¶ 74} Indeed, apparently that is the point. The state asserted at oral argument that the transfer of the juvenile to the adult system is about punishment, not procedure: “But the crux of the issue is punishment. That’s what this is all about. It’s not really about process, it’s not about procedure. It’s about what do we do to punish these juveniles who are transferred over to adult court.” (Emphasis added.) And because the issue implicates punishment, the Supreme Court’s teachings in J.D.B., Miller, and Roper regarding constitutional limitations on juvenile sentencing are implicated as strongly as its holding in Kent, 383 U.S. at 560, 86 S.Ct. 1045, 16 L.Ed.2d 84, which recognized that transfer hearings are “critically important” for juveniles.
ANALYSIS
{¶ 75} The majority’s holding today fundamentally misunderstands and minimizes the role of due process in juvenile cases. Although Ohio’s mandatory-transfer statute provides some process before depriving a child offender of access to the juvenile-justice system, that process is inadequate under the applicable balancing test established by the United States Supreme Court. Additionally, mandatory transfer does not comport with the concept of fundamental fairness, which we must apply to juveniles at risk of being deprived of a liberty interest. Given the paucity of precedent concerning juvenile-transfer statutes, this case will *513 offer the United States Supreme Court the opportunity to provide further guidance in this area.

Even under a Procedural Due-Process Analysis, the Majority Fails to Establish that the Limited Procedure of the Mandatory-Transfer Hearing Satisfies Constitutional Protections

{¶ 76} The Supreme Court recognizes that by enacting legislation, states may create liberty interests that are protected by the federal Due Process Clause. See, e.g., Sandin v. Conner, 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), citing Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). “Whether any procedural protections are due depends on the extent to which an individual will be ‘condemned to suffer grievous loss.’ ” Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), quoting Joint Anti-Fascist Refugee Commt. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). “The question is not merely the ‘weight’ of the individual’s interest, but whether the nature of the interest is one within the contemplation of the ‘liberty or property’ language of the Fourteenth Amendment.” Id., citing Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). “Once it is determined that due process applies, the question remains what process is due.” Id.
{¶ 77} The majority wholly fails to consider the balancing test applicable for determining what process is due to a juvenile at a mandatory-transfer hearing, in all likelihood because there is no way to do so without reaching the conclusion that the process that Ohio’s mandatory-transfer statute affords is not enough.[6]
*514 {¶ 78} Even if the majority were correct that the right to retaining juvenile status is not fundamental, once a state provides statutory rights greater than those afforded by the federal Constitution, the Constitution prohibits the state from divesting citizens of those rights without due process. See Connecticut Bd. of Pardons v. Dumschat, 452 U.S. 458, 463, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) (“A state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right”). See also Sandin at 483-484, citing Wolff (“we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause”).
(¶ 79} Here, there should be no debate that an alleged juvenile offender has a substantial liberty interest in retaining juvenile status. Since 1937, in Ohio, any child under age 18 who is alleged to have committed a crime has been subject in the first instance to the juvenile court and its attendant procedures. The General Assembly first created a discretionary-transfer scheme, then later created a mandatory-transfer scheme as the procedural mechanisms by which to deprive a child of his or her juvenile status and, as a result, access to the juvenile-justice system.
{¶ 80} Unlike some states with mandatory-transfer laws under which the child loses his or her juvenile status at the moment of the filing of a charge alleging a crime covered by the mandatory-transfer statute,[7] Ohio’s General Assembly provided some process to the child, requiring the juvenile court to find age eligibility and probable cause to believe that the child committed a crime covered by the mandatory-transfer statute before revoking juvenile status. Because this very limited process is insufficient to vindicate the child’s significant liberty interest in retaining juvenile status, I would conclude that it is unconstitutional.
{¶ 81} Because the requirements of due process are “flexible and call[ ] for such procedural protections as the particular situation demands,” Morrissey, 408 U.S. at 481, 92 S.Ct. 2593, 33 L.Ed.2d 484, courts must apply the framework *515 established in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), before validating actions adverse to an individual’s liberty interest.[8] Wilkinson v. Austin, 545 U.S. 209, 224, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005).
{¶ 82} Mathews requires consideration of three distinct factors:
[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Mathews at 335.
{¶ 83} In considering the first factor, there should be no debate that a child’s liberty interest in retaining juvenile status is substantial. “The possibility of transfer from juvenile court to a court of general criminal jurisdiction is a matter of great significance to the juvenile.” Breed, 421 U.S. at 535, 95 S.Ct. 1779, 44 L.Ed.2d 346. The child’s liberty interests clearly are in jeopardy if the child is treated as an adult, subject to adult penalties, in criminal courts. Not only do many child offenders receive harsher sentences in adult court, but all child offenders with adult convictions face the collateral consequences of those convictions—including public awareness of their crimes—in a manner far greater than they would in juvenile court.
{¶ 84} Notably, the law requires juvenile courts to seal records pertaining to juveniles who were arrested; juveniles whose cases were resolved without the filing of a complaint or by dismissal on the merits; juveniles who have successfully completed a pretrial diversion program; and juveniles who were adjudicated as *516 unruly children, have turned 18 years old, and are not under the jurisdiction of the juvenile court. R.C. 2151.356(B). Other records may be sealed six months after adjudication or after the unconditional discharge of the individual from the Department of Youth Services. R.C. 2151.356(C)(1)(a). There is no such requirement in adult court, in which the offender’s youthful mistakes are likely to stay in the public record forever.
{¶ 85} Indeed, this court has noted that the “collateral legal consequences associated with a felony conviction are severe and obvious.” State v. Golston, 71 Ohio St.3d 224, 227, 643 N.E.2d 109 (1994). Perhaps most severe is “the infamy and disgrace resulting from a felony conviction [that] seriously affects a person’s reputation and economic and social opportunities in our society.” Id. But an adult criminal conviction also raises more tangible penalties. Convicted felons may not serve on juries or hold an office of “honor, trust, or profit.” R.C. 2961.01(A)(1). Depending on the crime, an individual with a conviction may be statutorily precluded from engaging in many occupations and professions. See, e.g., R.C. 1321.37(B)(4) (commercial transactions); R.C. 3772.10(C)(1) (casino employee); R.C. 4709.13(B)(1) (barber); R.C. 4738.07(A)(4) (motor-vehicle-salvage work). Individuals convicted of violating certain drug laws, R.C. 4510.17, or firearm laws, R.C. 2923.122(F)(1), are subject to driver’s-license suspension.
{¶ 86} Moreover, research suggests that juveniles face far greater risks of violent attacks and suicide after being sentenced to imprisonment in adult facilities. Kimbrell, It Takes A Village to Waive A Child ... or at Least A Jury: Applying Apprendi to Juvenile Waiver Hearings in Oregon, 52 Willamette L.Rev. 61, 65 (2015). “[JJuveniles in adult facilities are five times more likely than adult offenders, and eight times more likely than juvenile offenders in juvenile facilities, to commit suicide.” Id. at 66.
{¶ 87} And importantly, juveniles who are transferred to adult court for a criminal trial are more likely to be incarcerated, more likely to receive longer periods of incarceration, and have significantly higher rates of recidivism and reoffend more quickly. Bishop, Frazier, Lanza-Kaduce, & Winner, The Transfer of Juveniles to Criminal Court: Does It Make a Difference?, 42 Crime & Delinquency 171, 183 (1996). No wonder that over the past decade, many states have enacted laws that once again channel young offenders to juvenile courts. See Crime and the Adolescent Brain, N.Y. Times (Mar. 12, 2017). Thus, a child’s liberty interest in retaining his or her status as a juvenile subject to the juvenile-justice system is significant.
{¶ 88} The second Mathews factor is the risk of an erroneous deprivation through the process offered. Ohio’s mandatory-transfer statute permits the judge to consider just two factors before transferring to adult court a juvenile accused of committing a crime covered by the law: the juvenile’s age at the time *517 of the charged offense and whether there is probable cause to believe that the juvenile committed the mandatory-transfer-eligible conduct. R.C. 2152.12(A). The statute does not permit the judge to consider any mitigating evidence, such as whether the accused lacks criminal history, has a mental illness, is emotionally or psychologically immature, or was under duress at the time of the alleged crime. All of these factors may be considered only at a discretionary-transfer hearing. R.C. 2152.12(E). Most importantly, there may be no consideration of whether the accused is amenable to rehabilitation, the hallmark purpose of the juvenile-justice system.
{¶ 89} As the United States Supreme Court recognized in Miller, “none of what [Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010)] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific.” Miller, 567 U.S. at 473, 132 S.Ct. 2455, 183 L.Ed.2d 407. And the court has recognized that “it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor’s character deficiencies will be reformed.” Roper, 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1. Ohio’s mandatory-transfer statute creates a system in which a judge has no right to even inquire into a juvenile’s potential for rehabilitation, let alone weigh it. Without allowing a judge to conduct any inquiry beyond probable cause or age, there is significant risk of turning a delinquent capable of rehabilitation into a lifelong criminal. Thus, the risk of erroneous deprivation of the child’s status as a juvenile offender is substantial.
{¶ 90} The third and final Mathews factor is the government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. “The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be ‘condemned to suffer grievous loss,’ and depends upon whether the recipient’s interest in avoiding that loss outweighs the governmental interest in summary adjudication.” Morrissey, 408 U.S. at 481, 92 S.Ct. 2593, 33 L.Ed.2d 484, quoting Joint Anti-Fascist Refugee Commt., 341 U.S. at 168, 71 S.Ct. 624, 95 L.Ed. 817 (Frankfurter, J., concurring). Mathews recognizes that “[a]t some point the benefit of an additional safeguard to the individual affected * * * and to society in terms of increased assurance that the action is just, may be outweighed by the cost.” 424 U.S. at 348, 96 S.Ct. 893, 47 L.Ed.2d 18.
{¶ 91} But a discretionary-transfer system is not a burden to the state or the bench. With respect to the time and resources required, the difference between an amenability hearing in discretionary-transfer proceedings and the token *518 hearing conducted prior to a mandatory transfer is minimal in the overall scheme. At a discretionary-transfer hearing, the judge must determine the age of the accused and whether there is probable cause to believe that he or she committed the charged crime, just as a judge must do at a mandatory-transfer hearing. See R.C. 2152.12(A) and (B). There are only two other, albeit significant, requirements at a discretionary-transfer hearing: the judge must determine whether the juvenile is “amenable to care or rehabilitation within the juvenile system, and [whether] the safety of the community * * ⅜ requires an adult sanction for the juvenile.” R.C. 2152.12(B)(3). To assist in making these determinations, the judge must order an investigation “into the child’s social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination.” R.C. 2152.12(C).
{¶ 92} The relevant question when considering the third Mathews factor is not whether the process will burden the state at all but, rather, whether the burden of additional procedural safeguards outweighs the child’s liberty interest in retaining juvenile status and the risk of erroneously depriving the child of that status.
{¶ 93} The child’s interest in retaining his or her juvenile status and the significant risk that children capable of rehabilitation will be prosecuted in adult court as a result of the bare-bones procedure set forth in the mandatory-transfer statute clearly outweigh the state’s limited burden of conducting the investigation required by R.C. 2152.12(C) prior to the transfer hearing. Accordingly, I would conclude that the limited “process” afforded under the mandatory-transfer statute is fundamentally inadequate and therefore unconstitutional.

Fundamental Fairness in Juvenile Proceedings Requires Consideration of a Juvenile’s Amenability to Rehabilitation and Treatment in the Juvenile-Justice System

{¶ 94} “[T]he applicable due process standard in juvenile proceedings, as developed by Gault [387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527] and Winship [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368] is fundamental fairness.” McKeiver v. Pennsylvania, 403 U.S. 528, 543, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (plurality opinion). As we have recognized, the meaning of fundamental fairness “ ‘can be as opaque as its importance is lofty.’ ” C.S., 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, at ¶ 80, quoting Lassiter v. Durham Cty. Dept. of Social Servs., 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). In Kent, the United States Supreme Court emphasized that a juvenile-transfer hearing is a “critically important” proceeding and “must measure up to the essentials of due process and fair treatment.” 383 U.S. at 560, 562, 86 S.Ct. 1045, 16 L.Ed.2d 84; accord Gault at 12, 87 S.Ct. 1428, 18 L.Ed.2d 527, citing Kent at 553.
*519 {¶ 95} The majority concludes that Aalim’s mandatory-transfer hearing satisfied the fundamental-fairness standards set forth in Kent because Aalim had a hearing at which his attorney and his mother were present and was given a written decision on transfer. Majority opinion at ¶ 27. The majority opinion thereby reduces the analysis to consideration of only two facts: the youth’s age as a number only and whether there is probable cause to believe that the youth committed the charged crime. Kent did not contemplate that result and did not endorse it as a matter of due process or fairness. Quite the contrary.
{¶ 96} In Kent, the juvenile appellant was subject not to mandatory transfer but to a juvenile-court judge’s decision to waive the jurisdiction of the juvenile court. But the effect of these two procedures is the same. Kent, like Aalim, was subject to the exclusive jurisdiction of the juvenile court when he was charged at age 16. Kent was also subject to a waiver of the juvenile court’s jurisdiction under the District of Columbia’s Juvenile Court Act. Under this statutory scheme, the juvenile-court judge could, after conducting a “full investigation,” waive the juvenile court’s jurisdiction and transfer the case to the district (i.e., adult) court for adjudication of an offender at least 16 years old and charged with an offense that, if committed by an adult, would be a felony. Kent at 547-548.
{¶ 97} On appeal, Kent challenged, on statutory and constitutional grounds, the juvenile-court judge’s waiver of jurisdiction. Although the Supreme Court made clear that juvenile-court judges enjoy broad discretion in determining the facts of a given case, it also emphasized that their exercise of that discretion was not “a license for arbitrary procedure.” Kent, 383 U.S. at 553, 86 S.Ct. 1045, 16 L.Ed.2d 84. In fact, the court explained, the District of Columbia’s waiver statute “requires a judgment in each case based on ‘an inquiry not only into the facts of the alleged offense but also into the question whether the parens patriae plan of procedure is desirable and proper in the particular case.’ ” Id. at 553, fn. 15, quoting Pee v. United States, 274 F.2d 556, 559 (D.C.Cir.1959). As the high court explained:
The net, therefore, is that petitioner—then a boy of 16—was by statute entitled to certain procedures and benefits as a consequence of his statutory right to the “exclusive” jurisdiction of the Juvenile Court. In these circumstances, considering particularly that decision as to waiver of jurisdiction and transfer of the matter to the District Court was potentially as important to petitioner as the difference between five years’ confinement and a death sentence, we conclude that, as a condition to a valid waiver order, petitioner was entitled to a hearing, including access by his counsel to the social records and probation or similar reports which *520 presumably are considered by the court, and to a statement of reasons for the Juvenile Court’s decision. We believe that this result is required by the statute read in the context of constitutional principles relating to due process and the assistance of counsel.
Id. at 557.
{¶ 98} Thus, the majority misunderstands Kent when it suggests that the Supreme Court held in that case only that “due process is satisfied when a juvenile court issues a decision stating its reasons for the transfer after conducting a hearing at which the juvenile is represented by counsel,” majority opinion at ¶ 24. Kent requires much more.
{¶ 99} For example, .the court required that Kent’s counsel be given access to the child’s social records. These were relevant to waiver because the “full investigation” required consideration of the “ ‘entire history of the child.’ ” Kent at 559, quoting Watkins v. United States, 343 F.2d 278, 282 (D.C.Cir.1964). Additionally, the court noted that a policy memorandum promulgated by the juvenile court regarding application of the District of Columbia’s waiver statute required that the juvenile-court judge consider such factors as the “sophistication and maturity of the juvenile” and the juvenile’s prior contacts with the justice system. Id. at 546, fn. 4, 566-567. The scope of this investigation is analogous to the investigation required under Ohio’s discretionary-transfer provision, R.C. 2151.12(C).
{¶ 100} In sum, the Supreme Court’s decision in Kent exemplified its belief in the origins and purpose of the juvenile-justice system, which has emphasized individualized assessment of the juvenile followed by rehabilitation and reintegration into society, rather than rote assessments focused only on the child’s age and misconduct, with the ultimate goal of punishment. See Hanning, 89 Ohio St.3d at 88-89, 728 N.E.2d 1059, citing D’Ambra, A Legal Response to Juvenile Crime: Why Waiver of Juvenile Offenders Is Not a Panacea, 2 Roger Williams U.L.Rev. 277, 280 (1997); Kent, 383 U.S. at 554, 86 S.Ct. 1045, 16 L.Ed.2d 84. Kent cannot be read so narrowly as to support the majority’s holding here.
{¶ 101} Using Kent as a guide, we turn to the nature of the mandatory-transfer hearing under R.C. 2152.12(A) to determine whether it comports with the essentials of due process and fair treatment that instructed the court’s decision in Kent. Ohio’s mandatory-transfer statute requires some process—namely, a hearing for the limited purpose of determining the juvenile’s age and whether there is probable cause to believe that he or she committed a mandatory-transfer-eligible offense. These determinations, however, are merely ministerial, thereby removing the juvenile court from its role as parens patriae. The mandatory-transfer hearing bears the appearance of process but lacks meaningful “ceremony” by *521 eliminating the opportunity for a full investigation into the child’s amenability to rehabilitation. See Kent at 554 (“We do not consider whether, on the merits, Kent should have been transferred; but there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statements of reasons”).
{¶ 102} For example, in Ohio’s mandatory-transfer hearing, consideration of age is simply a mathematical calculation and does not involve consideration of the youth’s maturity or sophistication. All that remains is a finding of probable cause to believe that the child committed a mandatory-transfer-eligible offense. And this is done as part of a limited process: “while the juvenile court has a duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense, it is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder.” A.J.S., 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 44. Additionally, the state’s evidence need not be unassailable, and the state has no burden to disprove alternate theories of the case. Id. at ¶ 46, 61.
{¶ 103} The consequences of transfer as a result of such perfunctory procedure are indeed tremendous. Once a juvenile has been transferred to adult court, the state need not prosecute the mandatory-transfer-eligible offense. For example, in this case, Aalim pleaded guilty in the common pleas court’s adult division to aggravated robbery, but the state dismissed the firearm specifications. Without those specifications in juvenile court, Aalim would not have been subject to mandatory transfer. Nonetheless, Aalim’s convictions in adult court for offenses that no longer were eligible for mandatory transfer carried the weight of adult punishment and its attendant collateral consequences.
{¶ 104} Thus, although the majority heralds the “process” attendant to the superficial hearing provided under Ohio’s mandatory-transfer statute, it does not approach the United States Supreme Court’s vision of a “critically important” proceeding at which a juvenile faces deprivation of the protections of the juvenile court system, nor does it provide the “ceremony” required of a decision with such tremendous consequences. Kent, 383 U.S. at 560, 557, 554, 86 S.Ct. 1045, 16 L.Ed.2d 84. Accordingly, I would conclude that Ohio’s mandatory-transfer proceeding does not comply with the fundamental-fairness standard required for juvenile-transfer proceedings.
{¶ 105} Given the majority’s failure today to recognize what the Supreme Court has repeatedly held regarding the rehabilitative potential of juvenile offenders and the importance of that determination in juvenile-transfer proceedings, this case implores a closer look by the high court. See Miller, 567 U.S. at *522 478, 132 S.Ct. 2455, 183 L.Ed.2d 407 (“mandatory punishment [of juveniles] disregards the possibility of rehabilitation even when the circumstances most suggest it”); Graham, 560 U.S. at 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 (“Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of ‘irretrievably depraved character’ ”), quoting Roper, 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1; Roper at 571, quoting Johnson v. Texas, 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (“From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor’s character deficiencies will be reformed. Indeed, ‘[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside’ ”).
{¶ 106} In the context of juvenile transfer to adult court, the Supreme Court has remained silent since Kent This fosters confusion as to what authority state legislatures have to enact mandatory-transfer statutes with limited or no process given the unclear standards for which, if any, procedural and substantive protections juveniles are entitled to prior to transfer to adult court. And this court, like all state courts (which handle almost all of the nation’s juvenile criminal cases), is in need of guidance given the paucity of constitutional guideposts and the dramatic increase in the states’ use of mandatory transfer after Kent and Gault— transfers that, as explained above, were intended to preclude juveniles’ rehabilitation to allow for their harsher punishment. This is particularly true given that the Supreme Court consistently has made clear over the last decade that in matters of punishment, we must at a minimum consider youth as a factor. See, e.g., Miller at 478; Graham at 68; Roper at 571. In so doing, the court has reminded us, repeatedly, that “[a] child’s age is far ‘more than a chronological fact.’ ” J.D.B., 564 U.S. at 272, 131 S.Ct. 2394, 180 L.Ed.2d 310, quoting Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). “Indeed, the court has seemed frustrated that it has repeatedly noted to us that minors are less mature and responsible than adults, that they are lacking in experience, perspective, and judgment, and that they are more vulnerable and susceptible to the pressures of peers than are adults.” State v. Long, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 33 (O’Connor, C.J., concurring), citing J.D.B. at 274-275.
{¶ 107} Although Aalim I was decided solely on the Ohio Constitution’s due-process clause, see Aalim I, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, at ¶ 25, 31, the majority eschews any distinction between our state Constitution and the United States Constitution for purposes of due-process analysis. Thus, today’s opinion is ripe for further review under the United States Supreme Court’s authority to define the protections and limits of the federal Constitution. *523 See, e.g., Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914) (“the question whether the process thus sanctioned by the court of last resort of the state constitutes due process of law within the meaning of the 14th Amendment being properly presented to this court for decision, we must exercise an independent judgment upon it”).
CONCLUSION
{¶ 108} “A fundamental requirement of due process is ‘the opportunity to be heard.’ It is an opportunity which must be granted at a meaningful time and in a meaningful manner.” Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), quoting Grannis at 394. A hearing in which there is no consideration of a juvenile’s amenability to rehabilitation and treatment in the juvenile-justice system is not a meaningful opportunity to be heard. Because the limited process provided by Ohio’s mandatory-transfer statute falls short of due process and fundamental fairness for the juvenile, I would conclude that it is unconstitutional.
{¶ 109} I do not quarrel with the notion that a juvenile who commits a serious, violent crime should be punished or that transfer to adult court is proper in some instances. See, e.g., State v. Watson, 47 Ohio St.3d 93, 547 N.E.2d 1181 (1989) (holding that a juvenile-court judge’s broad discretion to retain or relinquish jurisdiction included discretion to order the transfer of a 15-year-old male with no prior criminal record, no major disciplinary issues at school, and no psychiatric disorder because he had beaten another juvenile to death with a tree limb). But the suggestion that this court is not authorized to invalidate a transfer statute that does not pass constitutional muster offends the doctrines of separation of powers and checks and balances, both hallmarks of our republic. Here, the mandatory-transfer statute is one of those legislative enactments that falls constitutionally short. The majority’s decision ignores that juveniles are entitled to a liberty interest that cannot be arbitrarily deprived, and reduces the role of juvenile-court judges, who are elected by the people to determine, among other things, whether a juvenile is amenable to rehabilitation. For these reasons, and knowing that “history has its eyes on” us, I cannot give countenance to the majority’s decision on reconsideration. See Lin-Manuel Miranda, “History Has Its Eyes On You,” Hamilton (Original Broadway Cast Recording).
O’Neill, J., concurs in the foregoing opinion.

. The state contends, and the majority agrees, that reconsideration of Aalim I is warranted because this court failed to consider Article IV, Section 4(B) of the Ohio Constitution, which generally confers authority to the General Assembly to define the jurisdiction of the courts of common pleas. The state raised that rationale during oral argument on the merits of this case. Aalim I clearly acknowledged that juvenile courts are a legislative creation and that the General Assembly has *508 made substantive changes to the Juvenile Code. Aalim I at V 16. And a concurring and dissenting opinion stated, “[T]he General Assembly created Ohio’s juvenile courts in R.C. Chapter 2161, and consequently, juvenile courts are creatures of statute. As a statutorily created court, the juvenile court has limited jurisdiction, and it can exer.cise only the authority conferred upon it by the General Assembly.” (Citation omitted.) Aalim I at ¶ 39 (Kennedy, J., concurring and dissenting). Thus, the state’s motion for reconsideration relies on no new fact or legal argument that we failed to consider in Aalim I. See S.Ct.Prac.R. 18.02(B) (“A motion for reconsideration shall not constitute a reargument of the case ⅜ * * ”). Reconsideration is therefore unwarranted here.

. After his motion to dismiss on constitutional grounds was denied, Aalim pleaded no contest as part of a plea bargain in which the state dismissed the firearm specifications. He was sentenced to four years of imprisonment on each count, to run concurrently, in addition to five years of postrelease control and restitution of $531.97, ostensibly for the cell phone that he was convicted of stealing.

. In 1986, the General Assembly enacted the first mandatory-transfer statute in Ohio, the precursor of the mandatory-transfer statute currently codified in R.C. Chapter 2162. Sub.H.B. No. 499, 141 Ohio Laws, Part II, 4633 (effective Mar. 11,1987).

. In a discretionary transfer, the juvenile-court judge has the discretion to relinquish the juvenile court’s jurisdiction over a youth and transfer or “bind over” the juvenile to adult court if the judge determines that the individual is not amenable to care or rehabilitation within the juvenile-justice system and appears to be a threat to public safety. See R.C. 2151.26(B)(3). The rubric of a mandatory transfer is quite different.

. The concurring opinion’s attack on substantive due process is also misplaced because the court’s decision in Aalim I was premised on the tenets of procedural due process, see Aalim I, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, ¶ 25 (“juvenile procedures themselves also must account for the differences in children versus adults”). And in any event, the concurrence is unpersuasive on its merits. The United States Supreme Court has limited the substantive-due-process doctrine but has not abandoned it. See, e.g., Lawrence v. Texas, 539 U.S. 558, 573-574, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), citing Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Although Justice Thomas recently declared in a dissenting opinion that “the Due Process Clause confers no substantive rights,” Nelson v. Colorado, - U.S. -, 137 S.Ct. 1249, 1265, 197 L.Ed.2d 611 (2017) (Thomas, J., dissenting), his opinion was not joined by any other justice. Similarly unpersuasive are the concurrence’s citations to a dissenting opinion and a concurring opinion to support its position as to what federal constitutional law should be. Concurring opinion at ¶ 40, 47.
The concurring opinion’s characterization of the procedural-due-process standard is also flawed. The opinion declares, with citation to a treatise and federal Court of Appeals decisions that cite the same, “When the legislature passes a law of general application, there is no question about the adequacy of the procedures; the legislative process provides all the process that is due.” Id. at ¶ 41. This statement is remarkably overbroad and offered without any context. In the Supreme Court’s most recent due-process decision, the court struck down a state statute as unconstitutional *514 because it created too many procedural hurdles for an individual to vindicate his or her right to regain money paid to the state as the result of a conviction that has been overturned. Nelson at -, 137 S.Ct. at 1257-1258. The court applied “[t]he familiar procedural due process inspection instructed by Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976),” Nelson at -, 137 S.Ct. at 1255, as we should here.

. See, e.g., Conn.Gen.Stat.Ann. 46b-127(a) (a child immediately loses juvenile status upon being charged with certain crimes if the child was at least 15 years old at the time of the alleged offense); D.C.Code 16-2301 (the definition of “child” in juvenile-court jurisdictional statute excludes individuals aged 16 or older who are charged with certain crimes); N.Y.Penal Law 30.00 (13- to 15-year-olds are criminally responsible for certain offenses and not subject to the jurisdiction of the juvenile court).

. In Patterson v. New York, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Supreme Court set forth a narrower procedural-due-proeess inquiry than the Mathews framework for application in matters of criminal procedure: whether a state rule “ ‘offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.’ ” Id. at 202, quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). But the Supreme Court has made clear that this narrower standard applies to state procedural rules that are part of the criminal process. Medina v. California, 505 U.S. 437, 443, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). Thus, it is irrelevant here because we have previously established that “Qjuvenile delinquency proceedings are civil rather than criminal in character,” In re A.J.S., 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 26; see also In re A.G., 148 Ohio St.3d 118, 2016-Ohio-3306, 69 N.E.3d 646, ¶ 26 (O’Donnell, J., dissenting, joined by French and Kennedy, JJ.) (“ ‘a juvenile court proceeding is a civil action’ ”), quoting State v. Adkins, 129 Ohio St.3d 287, 2011-Ohio-3141, 951 N.E.2d 766, ¶ 10. Notably, I am aware of no juvenile case in which the United States Supreme Court applied the Patterson standard to a due-process challenge.